IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JULIE JEAN BELDEN,<br><br>                    Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of the Social Security Administration,<br><br>                    Defendant. | 4:11-CV-3221<br><br>MEMORANDUM AND ORDER |

  This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Julie Jean Belden's disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Court has considered the parties' filings and the administrative record, and affirms the Commissioner's decision to deny benefits.

PROCEDURAL HISTORY

  Belden filed applications for disability insurance benefits and supplemental security income in March 2009. T149-58. Belden's claims were denied initially and on reconsideration. T56-59, 66-78. Following a hearing, the administrative law judge (ALJ) found that Belden was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), or 1382(a)(3)(A), and therefore not entitled to disability benefits. The ALJ determined that, although Belden suffered from several severe impairments, and could no longer perform her past relevant work, she had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T8-21. The Appeals Council of the Social Security Administration denied Belden's request for review of the ALJ's decision. T1-4. Belden's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

FACTUAL BACKGROUND

  Belden suffers from a number of diagnosed physical and mental conditions. Her physical condition is not at issue in this appeal: the ALJ found that Belden suffered from severe physical impairments and considered

them in finding that there are physical limitations on Belden's ability to work. Neither Belden nor the government take issue with the ALJ's findings in that regard (with one limited exception that will be discussed below). So, this appeal is about Belden's mental impairments. The record contains extensive evidence of Belden's mental health treatment and evaluation; that record has been fully reviewed, but only the portions relied upon by the ALJ or the parties will be summarized below.

## MENTAL HEALTH HISTORY

Belden had been treated since 2005 at the Mid-Plains Center for Behavioral Health for bipolar disorder, attention deficit hyperactivity disorder (ADHD), obsessive-compulsive disorder (OCD), and drug addiction/alcoholism. T311, 336, 437, 445. Belden was evaluated for Social Security purposes on April 29, 2008, by Jennifer Bruning Brown, PhD. At that time, Belden alleged bipolar disorder and schizophrenia. T311. She was found to have moderate limitations in her abilities to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from superiors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. T309-10.

Belden was evaluated on May 8, 2009, by A. James Fix, PhD. T341. Fix diagnosed Belden with bipolar disorder, alcohol dependence and polysubstance abuse, and a personality disorder of a type not otherwise specified (NOS), with severe psychosocial stressors from unemployment and "essential homelessness." (Belden was, at the time, living with a friend.) T349. On a supplemental questionnaire, Fix opined that there were restrictions on Belden's activities of daily living, in that she did not "involve herself in goal-oriented activities." Fix stated that Belden's "irritability" and "oppositionalism" created difficulties in maintaining social functioning. Fix identified "mood swings" and "some panic episodes" as recurrent episodes of deterioration when stressed. Fix opined that "[f]or certain tasks" Belden lacked the ability to sustain concentration and attention needed for task completion, and that she lacked the ability to carry out short and simple instructions under ordinary supervision because "oppositionalism gets in the way of task concentration." Fix observed that Belden's ability to relate appropriately to coworkers and supervisors was "compromised by irritability [and] self-involvement." T343.

But Fix also opined, at the end of his evaluation, that Belden could sustain concentration and attention for simple tasks, was able to understand and remember short and simple instructions, and could carry out those instructions under ordinary supervision although she was "rebellious and oppositional." Fix opined that Belden "is able to relate appropriately to other people, when she wants to." T350.

Belden was evaluated on June 10, 2009, by Christopher Milne, PhD. T372. Milne's diagnoses were similar to those previously established, and Milne found that Belden had moderate difficulty in maintaining social functioning, combined with a mild restriction in the activities of daily living. However, Milne found that Belden had no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. T382. Milne observed that drug and alcohol use "appears material in this case[,]" and opined that without drugs and alcohol, Belden "appears capable of simple, unskilled employment[.]" T384.

Belden was hospitalized in July 2009 after reporting with depression and suicidal ideation. T403-04. Her final diagnosis from that hospitalization included schizoaffective disorder, bipolar type; depression with suicidal and homicidal ideation; overt psychotic symptoms; posttraumatic stress disorder (PTSD); ADHD which had been stabilized with medication, poly drug abuse including alcohol and marijuana; personality disorder, NOS; dramatic, emotional or erratic personality traits with prominent borderline features; psychosocial stressors secondary to relationship issues; and poor medication compliance. T403. She tested positive for marijuana and opioids, and was noted as "quite uncooperative at the time of admission" and during the psychiatric assessment. T405.

On November 29, 2009, Belden's treating therapists at Mid-Plains, Alan Baumgardner, PA, and Navdeep Sood, M.D., completed a mental impairment evaluation form prepared by Belden's counsel. T447. They identified Belden's impairments as bipolar disorder, OCD, ADHD, and chemical dependence in remission. They identified the bipolar disorder and OCD as being disabling. They explained that increased stresses, including increased workload, unexpected problems, or discipline by supervisors, caused Belden to harm herself, including attempts at suicide. T445. They found the same moderate limitations as Brown had, as discussed above, and also found Belden to be moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. T448-50. And they opined that the maximum total workday for Belden was "zero." T450. They found that she had "poor" abilities to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, maintain

attention/concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. T454-55.

Lee Branham, PhD, completed a residual functional capacity assessment on December 4, 2009. T457. Branham found that Belden had a mild restriction on activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and one or two episodes of decompensation of extended duration. T467. But Branham found that Belden was moderately limited only in her abilities to understand and remember detailed instructions and carry them out, maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others. Branham found that Belden was *not* significantly limited in other areas, including her abilities to carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. T472-73.

Branham explained that Fix's observation that Belden could do things "'when she wants to'" was consistent with Belden's mental status examination and other evidence, and "given considerable weight." Branham discounted Belden's allegation of "'borderline schizophrenia[,]'" noting that it "may be supported by some report of hallucinations and the diagnosis of schizoaffective disorder in her recent crisis" but that the "evidence is not consistent with a schizophrenic process." Branham also noted that Belden's work record showed "a tendency to have problems" but that she had "apparently carried out the job well enough to be employed for 4 years[,]" and that her problems in that regard were "highly consistent with her significant history" of drug addiction and alcoholism. T474.

### HEARING TESTIMONY

At the hearing, Belden amended her date of disability onset to coincide with her alleged date of sobriety, which was August 21, 2009. T33. Testifying regarding her disability, she explained that she didn't "function very well" with her "bipolar" and "schizo." T28. Belden claimed that she heard voices, about once a week, that told her to commit suicide. T34. She talked about interpersonal difficulties with her coworkers, and how she did not react well

to changes at work because, she said, "I rebelled against it because I just don't do change." T35-37.

She also explained that she had a sleeping disorder which caused her to sometimes not sleep at night, but at other times sleep all the time, which allegedly cost her a job because she fell asleep at work. T28. She said that on a typical day, she cleaned house, watched television, and played with her cats. She cooked, but her husband did the laundry. She drove, but not often. T30. She said that she was unable to concentrate on anything for more than 10 minutes. T36. And, she said, she was unable to complete a regular workday or workweek because she could not focus or concentrate, and abandoned tasks if she became agitated. T37.

### SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

### STEP ONE

At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. 20 C.F.R. § 404.1520(a)(4)(i); *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. 20 C.F.R. § 404.1520(a)(4)(i); *Gonzales*, 465 F.3d at 894.

In this case, the ALJ found that Belden had not engaged in substantial gainful activity since her alleged disability onset date, and that finding is not disputed on appeal. T10.

### STEPS TWO AND THREE

At the second step, the claimant has the burden to prove she has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits [her] physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also, Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that [her] impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe,

and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." 20 C.F.R. § 404.1520a(a), (d)(1) and (2). The ALJ must first determine whether the claimant has "medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The first three criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id.*

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). 20 C.F.R. § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. 20 C.F.R. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*.

In this case, at step two, the ALJ found that Belden had several severe impairments: bipolar disorder, schizoaffective disorder, fibromyalgia, congestive heart failure, reactive airway disease, and obesity. T10. But at step 3, the ALJ found that Belden did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ noted that Belden had not made any argument to that effect. T11.

### RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations

- 6 -

that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, 20 C.F.R. § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of the claimant's limitations caused by her impairments, including limitations resulting from symptoms, provided by the claimant or other persons. 20 C.F.R. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); Social Security Ruling (SSR) 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims. All limits on work-related activities resulting from a claimant's mental impairments must be described in the mental RFC assessment. SSR 85-16: Titles II and XVI: Residual Functional Capacity for Mental Impairments. An RFC must assess the claimant's ability to meet the mental requirements of work, 20 C.F.R. § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p. The RFC must include all limits on work-related activities resulting from a claimant's mental impairments. SSR 85-16.

As alluded to above, a special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is

satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[1] and "other evidence."[2] 20 C.F.R. § 404.1529(c)(1) to (3).

The ALJ considers the claimant's statements about "the intensity, persistence, and limiting effects of [her] symptoms," and evaluates them "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; 20 C.F.R. § 404.1529(d)(4). In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(i–vii).[3] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

The ALJ found that Belden had the RFC to perform sedentary work in that she was able to lift and carry up to 10 pounds, stand and walk for 2 hours of an 8-hour day, and sit for 6 hours of an 8-hour day. Among other physical limitations, Belden was required to avoid concentrated exposure to excessive vibration, pulmonary irritants, industrial hazards, and unprotected heights. Mentally, she was limited to unskilled work, requiring no more than occasional contact with the general public and coworkers. T12.

In reaching that conclusion, the ALJ found that while some of Belden's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms[,]" her "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not credible to

---

[1] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[2] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. See 20 C.F.R. § 404.1529(a)(1), and the sections referred to therein, as well as 20 C.F.R. § 404.1529(c)(3).

[3] In assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524.

the extent" they were inconsistent with the ALJ's determination of Belden's RFC. Among other things, the ALJ noted a lack of treatment for pain since the alleged onset date. T13. And, the ALJ noted, Belden's work record revealed "sporadic and substandard earnings throughout [her] adult life[,]" raising a question "as to whether [she] is actually motivated to work." T14. The ALJ also observed several inconsistencies in the medical records regarding the medications that had been prescribed for Belden's physical conditions. T15.

With respect to Belden's psychiatric impairments, the ALJ generally found that when Belden was complying with treatment recommendations, they were effective in controlling her moods and functioning. While Belden's symptoms had occasionally been exacerbated, those incidents were generally related to substance use or improper use of medications. And, the ALJ found, the record did not reflect the hallucinations Belden had described, and such hallucinations were not mentioned in the medical records after Belden stopped using alcohol and marijuana (which was also Belden's alleged onset date). T16. The ALJ also noted other inconsistencies in the statements Belden had made to various medical professionals. T17.

The ALJ found that Belden had mild limitations in her activities of daily living. Belden was moderately limited in social functioning, based on mixed evidence regarding her interaction with others, so she would require work that involved no more than occasional contact with the general public and coworkers. T17. Belden's difficulty concentrating resulted in a limitation to unskilled work. T18. And the ALJ found that the record "fails to document any episodes of decompensation of any duration." Belden's hospitalization for 4 days in July 2009, the ALJ said, did not satisfy the regulatory definition of an extended episode of decompensation. T18.

The ALJ also evaluated the opinion testimony described above. The ALJ afforded Fix's opinion "little weight[,]" because Fix's answers on a checklist of conditions at the beginning of his report contradicted some of the observations made at the end of the report. The ALJ was also unpersuaded by the report made by Baumgardner and Sood, finding that the opinion was not well-supported by the progress notes from their facility. The ALJ also noted the inconsistency between the "moderate" limitations found in part of the report and the "poor" findings made for similar functioning later in the report. T18. The ALJ instead credited Branham's opinion, although disagreeing with Branham's apparent conclusion that Belden's July 2009 hospitalization met the definition of an episode of decompensation. The ALJ found that Branham's opinion was "consistent with the record as a whole, particularly the mental status examinations of the Mid-Plains Center." T18. And the ALJ considered the other evaluations set forth above, but gave them

little weight because they were issued before Belden's amended onset date, and while Belden was still abusing drugs and alcohol. T18-19.

### STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales*, 465 F.3d at 894. If the claimant can still do her past relevant work, she will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v).

In this case, at step four, the ALJ found that Belden was unable to perform any past relevant work. T19. But the ALJ found, based on the testimony of the vocational expert (VE), that there were jobs that exist in significant numbers in the national economy that Belden could perform. T19. So, the ALJ concluded that Belden was not under a disability, and denied her claims for benefits.

### STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*. The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## BELDEN'S ARGUMENTS
### FAILURE TO EVALUATE ALL SEVERE IMPAIRMENTS

Belden's first argument is that the ALJ erred in not evaluating all of her severe impairments. She contends that the ALJ erred by not finding that her personality disorder NOS, OCD, and ADHD were severe impairments. Filing 18 at 7. This argument appears to be directed at the ALJ's failure, at step two, to identify those diagnosed conditions as "severe." The Court notes that although Belden refers the Court to evidence supporting the *diagnosis* of those conditions, Belden does not refer the Court to evidence establishing that they were "severe" within the meaning of 20 C.F.R. § 404.1520(a)(4)(ii).

But more importantly, it is not clear how Belden could have been prejudiced by the omission. The ALJ found that Belden suffered from severe impairments, and therefore proceeded through the rest of the five-step analysis. Belden did not argue, here or before the ALJ, that she satisfied the criteria for a presumptively disabling impairment at step three of the analysis, with or without the impairments she complains were omitted. And in determining Belden's RFC, and conducting steps four and five of the analysis, the ALJ clearly considered *all* of Belden's diagnoses, including those she claims should have been considered "severe." T15.

In short, Belden presents no basis for reversing the ALJ's decision.

### FAILURE TO FOLLOW FIX'S OPINION

Next, Belden argues that the ALJ erred in not finding Fix's opinion persuasive. Belden contends that the ALJ "failed to include all of the documented conditions and limitations imposed by Dr. Fix and gave an erroneous reason why such opinions should be discredited." Filing 18 at 7-8. But nothing in Belden's brief explains *why* that reason was erroneous. *See* Filing 18. As noted above, Fix ultimately concluded (despite contrary indications elsewhere in his opinion) that Belden could perform simple tasks and follow short and simple instructions, when she wanted to—conclusions that were ultimately adopted, in large measure, by Branham. *See* T350, 474. The ALJ did not err, given the inconsistency in Fix's opinion, by relying more on Branham than Fix. Belden does not offer a persuasive argument to the contrary.

### FAILURE TO FIND EPISODES OF DECOMPENSATION

Belden contends that the ALJ erred by rejecting Branham's opinion that Belden had suffered from at least one episode of decompensation. Filing 18 at 8. As noted above, the ALJ found Branham's opinion generally persuasive, but disagreed that Belden's hospitalization was an episode of "decompensation." Belden contends that was error.

But Belden does not clearly explain the import of this argument—that is, Belden does not explain how a finding of a single episode of decompensation would affect any part of the analysis or conclusion of the ALJ. The ALJ's reference to that episode seems to be a finding that it was not a repeated episode of decompensation of extended duration within the meaning of 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00(C)(4)—a finding that was, indisputably, correct. *See id.* And in any event, that finding could only be determinative at step three of the five-part analysis, which Belden does not appear to contest.

In other words, Belden does not articulate how a finding of an episode of decompensation would affect her RFC, which is really what is at issue here. In the absence of such an explanation, there is no basis here for reversing the agency decision.

### FAILURE TO CREDIT OPINION OF BAUMGARDNER AND SOOD

Next, Belden argues that the opinion of Baumgardner and Sood should have been regarded by the ALJ as controlling, or at least given greater weight, because they had a long-standing treatment relationship with Belden. Filing 18 at 8. But 20 C.F.R. § 404.1527(c)(2) explains that a treating source's opinion on the nature and severity of an impairment will be given controlling weight only when "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record[.]" And an ALJ may discount a treating physician's medical statement where the limitations on the form stand alone, and are not mentioned in the records of treatment, nor supported my objective testing or reasoning. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). Here, the ALJ explained in detail why he found that Baumgardner and Sood's opinion was *not* well-supported or consistent with the medical records. T18.

Belden contends that the ALJ "simply ignored the opinions of Dr. Sood and Mr. Baumgardner" and "offered no reason for his rejection of the limitations identified by Dr. Sood and Mr. Baumgardner." Filing 18 at 13. This is not consistent with the record. And because Belden has not engaged the ALJ's finding, the Court is now left with no explanation of *why* Belden might disagree with the ALJ's reasoning. In the absence of such an explanation, the Court has no basis for disagreeing with the ALJ's reasons for finding Baumgardner and Sood's opinion unpersuasive.

### INSUFFICIENT HYPOTHETICAL FOR VOCATIONAL EXPERT

The ALJ's finding at step five of the five-step analysis depended upon the answers of the VE to hypothetical questions that described the ALJ's

findings of Belden's RFC. Belden claims that the hypotheticals did not accurately describe her impairments. Filing 18 at 8.

A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant. *Howard v. Massanari*, 255 F.3d 577, 581–82 (8th Cir. 2001). Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies. *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007). However, a hypothetical must include only those impairments and limitations that are supported by the record, which the ALJ accepts as valid, and which the ALJ finds to be credible. *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000).

The Court reviews an ALJ's hypotheticals for substance over form. While the hypothetical question must set forth all the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments. *Howard*, 255 F.3d at 582. In other words, the ALJ need only provide the VE with an accurate assessment of what the claimant "'can and cannot do.'" *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).

Belden's first argument is that the ALJ failed to consider the evidence of her numerous impairments when asking the hypotheticals. Filing 18 at 16. But the substance of Belden's argument is really about the RFC, not the hypothetical. In other words, Belden's first argument here is really another version of the arguments discussed above—that the ALJ should have adopted the limitations imposed by Fix's opinion. That argument is simply unsupported here, as it was above.

Belden's other argument with respect to the VE's testimony is that despite finding Branham's opinion persuasive, the ALJ failed to include the limitations imposed by Branham in the hypotheticals. Filing 18 at 12. But Branham found only "moderate" limitations in Belden's abilities to understand and remember detailed instructions and carry them out, maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others. T472-73. And Branham opined that Belden could do some of those things when she wanted to. T474. The ALJ noted conflicting evidence in the record regarding Belden's ability to concentrate and focus. T17. And most importantly, the ALJ considered all of that evidence in concluding that Belden was limited to unskilled work. T18.

In short, the ALJ considered all the evidence, including Branham's opinion, and imposed a limitation based on that evidence. As noted above, a

hypothetical must include only those impairments and limitations that are supported by the record, which the ALJ accepts as valid, and which the ALJ finds to be credible. *Gragg,* 615 F.3d at 940; *Young,* 221 F.3d at 1069. The hypotheticals posed here satisfied that standard.

### EVALUATION OF BELDEN'S CREDIBILITY

Finally, Belden argues that the ALJ failed to properly apply the factors to be considered in evaluating her credibility. Filing 18 at 8. As noted above, in assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524. Belden claims that the ALJ ignored those criteria. Filing 18 at 17. Belden contends:

> The ALJ failed to consider the plaintiff's daily activities, the precipitating and aggravating factors, the treatments, medications and their effectiveness; the frequency, intensity and duration [of symptoms]; and the functional restrictions caused by the plaintiff's conditions. No analysis was performed to discredit the credibility of the plaintiff.

Filing 18 at 17.

This assertion is not supported by the record. Although the ALJ did not enumerate each factor and explain it separately, each of the factors listed was discussed in the ALJ's comprehensive discussion of why he found Belden's testimony to be, in part, unpersuasive. T12-19. The Court defers to that conclusion, *see Boettcher,* 652 F.3d at 863, and finds no reversible error in that regard.

### CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Belden. The Court therefore concludes that the Commissioner's decision was supported by substantial evidence and should be affirmed.

IT IS ORDERED:

1.  The Commissioner's decision is affirmed.

2. Belden's complaint is dismissed.

3. The parties shall bear their own costs.

4. A separate judgment will be entered.

Dated this 16th day of October, 2012.

BY THE COURT:

John M. Gerrard
United States District Judge